IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA MULLER, Plaintiff, v. RICH MORGAN, CHELSEA KLINKE, RHYTHM MANANI, BELLUS ALC INVESTMENTS 1, LLC d/b/a AMERICAN LASER SKINCARE, Defendants. | Case No. 12 C 1815 Hon. Harry D. Leinenweber |

**MEMORANDUM OPINION AND ORDER**

### I. BACKGROUND

According to her 28-page, 8-count Complaint, the Defendants sexually harassed Melissa Muller ("Muller"), interfered with her family and medical leave rights, retaliated against her for cooperating in a company investigation of the sexual harassment and for filing a claim with the EEOC, intentionally inflicted emotional distress on her, interfered with her contractual relationship and prospective economic advantages, and conspired against her. The Defendants include Rich Morgan ("Morgan"), the former CEO of American Laser Skincare ("ALS") which was Plaintiff's employer, Chelsea Klinke ("Klinke"), Vice- President of Sales and Clinic Management for ALS, Rhythm Manani ("Manani"), General Counsel and Vice-President of Human Resources of ALS, and Bellus ALC Investments 1, LLC ("Bellus"), the purchaser of the assets of ALS from the latter's bankruptcy estate.

ALS, prior to its sale out of bankruptcy, was in the business of providing laser hair removal and noninvasive aesthetic services in multiple locations throughout the United States. Muller commenced her employment with ALS in 2006 as a laser technician. She excelled at her job and was quickly promoted to Clinic Manager in charge of ALS's Clinic in Chicago's Lincoln Park. In December 2009, Muller attended a team dinner for the entire Midwest Region, at which Morgan and Klinke were in attendance. At this dinner Morgan asked her a number of questions about her intentions as to future pregnancies, and whether she was happily married. Muller took this latter inquiry as an expression of Morgan's sexual and romantic interest in her. Shortly after the meeting she was promoted to the position of Regional Manager of the Midwest. Over the next year she successfully increased the region's sales.

In January 2010, Muller attended an executive management team meeting along with Morgan, Klinke, and several other members of ALS management. At this meeting Morgan suggested to the gathering that they talk about sex. He then proceeded to ask Muller and another female regional manager how many sexual partners they had had. In September 2010, the company held another dinner for regional managers and executive staff. Morgan became visibly intoxicated at the dinner and made leering comments to a number of female attendees. During dinner the attendees discussed what sort of plastic surgery they would consider having done. Muller and another female attendee said they would consider plastic surgery on their breasts. Morgan then

stated that he was an expert on the subject and he should take a look at their breasts. Without obtaining approval he proceeded to do so.

After this meeting, another female attendee hired a lawyer and complained about the way female managers had been treated. This prompted the company to initiate an investigation to be conducted by an outside attorney. In the weeks following, Muller was contacted by the administrative assistant to the outside attorney, Manani, and Klinke who informed her that she would have to be interviewed as part of the investigation. Klinke contacted Muller multiple times prior to her interview in an apparent attempt to determine what Muller would tell the investigators. She also relayed her opinion as to how important Morgan was to ALS and that she did not want him to be removed. Klinke asked Muller how she felt about Morgan and when she told Klinke that she thought he might be demoted, Klinke made sarcastic remarks and then implored Muller to testify that she had not felt violated when Morgan looked down her shirt.

In September, Muller flew to Michigan to be interviewed by the outside counsel. Prior to her meeting Klinke again called Muller and urged her to keep her answers short and not to give out too much information. During the interview Muller told the counsel about the shirt incident as well as Morgan's comments about sex and his questions about the state of her marriage, and her family plans. The counsel also asked her whether she knew about any inappropriate relationships Morgan had with the staff. Muller informed him of two

- 3 -

relationships she was aware if that he had, one with a Clinic Manager and another with a former Regional Manager. She further informed him that at the time of the relationship Muller was the assistant to the Clinic Manager and that Morgan had flown her to Las Vegas where he gave her a very expensive watch. She also told the counsel that she had been informed that the Regional Manager had obtained money from Morgan which apparently was paid in return for her silence. The counsel asked her if she had been coached as to what to say and she told him that she had been. She stated that she was afraid that others would find out about her testimony. He informed her that only the Board of Directors would be informed about the substance of her testimony

     Immediately after the interview, Klinke called Muller and grilled her about what she had said in the interview. Among other things Klinke asked Muller if she had been asked about any rumors involving Klinke and Morgan. Muller responded in the affirmative which caused Klinke to "freak out." Apparently as a result of the investigation Morgan was removed as CEO but was not fired. Shortly after this the newly appointed CEO, Steve Strauss ("Strauss"), visited Muller and asked her how she felt about Morgan's removal as CEO. She responded generally favorably but later learned from Klinke that Morgan was still employed with the company in a part-time role.

     In the fall of 2010 Muller became pregnant. She told Klinke, who was unenthusiastic, and responded that they couldn't have everyone getting pregnant at the same time. In January 2011, Muller

was contacted by the newly appointed Director of Sales for the West Coast along with Klinke to tell Muller that she was being placed on a Performance Improvement Plan (the "PIP"), even though her work for the company had never before been criticized. She was assured that the PIP was for guidance rather than discipline.

Subsequently she was asked to name the individual who would take her place while she was on maternity leave. After she told them her selection, it was criticized. A short time later she was told by Klinke that she needed to step down as Regional Manager and assume the position of Clinic Manager because "she didn't have what it takes to be a leader in her region." Muller began to cry and started to have contractions. She saw her obstetrician who diagnosed her has having "situational stress induced contractions." Later that month prior to her leave she was actually demoted to Clinic Manager of another Chicago clinic at greatly reduced pay.

Muller began her maternity leave in May 2011 and returned to work as Clinic Manager in July. Her clinic flourished. In August 2011 she filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). Klinke began a road show in October giving out awards for outstanding service. Even though Muller was the number one salesperson in the region she was not given an award. The following day Muller was given a "final warning" by her supervisor which stated that she had ninety (90) days to improve her performance despite her excellent sales numbers. She was told by her supervisor that she had been told by "corporate" to give the

warning even though she thought that Muller was an excellent clinic manager. During this period Klinke fired Muller's assistant and refused to allow her to hire a replacement which greatly increased the amount of time Muller had to put in. Klinke then visited Muller's clinic apparently in order to criticize her performance. Muller disputed this criticism.

In December 2011, ALS filed for bankruptcy, which was just prior to Klinke's last visit. Although Muller had received her Right-to-Sue letter in November, she was unable to file suit against ALS because of the automatic stay that had been entered. During the pendency of the bankruptcy the ninety (90) day time period for Muller's final warning came to an end. Klinke gave Muller "a strong talking to" about her poor performance but did not fire her. In January 2012, ALS received bankruptcy court approval to sell substantially all of its assets free and clear of any liabilities. ALS announced that a private equity firm, Versa, was financing the asset sale and the assets were to be purchased through an affiliate, the Defendant Bellus. The day before the closing an unnamed individual, who identified himself as being an employee of Versa, called Muller at work and told her that she was fired effective immediately.

## II. DISCUSSION

Muller bases her 8-count Complaint on the foregoing. All Defendants save Morgan, have moved to dismiss. Klinke, Manani, and Bellus contend that this Court has no personal jurisdiction over

them, and thus they are entitled to dismissal under Rule 12(b)(2). They also contend that the statutory counts should be dismissed under Rule 12(b)(6) because none of these counts contain "enough facts to state a claim to relief that is plausible on its face."

They also contend that similarly none of the other counts state a claim and therefore they should also be dismissed under Rule 12(b)(6).

The Defendant supports their Rule 12(b)(2) Motions with the Affidavits of Klinke, Manani, and Paul Halpern ("Halpern"), who was authorized to act on behalf of Bellus. Based on the affidavits, neither Klinke nor Manani have ever lived in Illinois, owned property in Illinois, been liable for taxes in Illinois, voted in Illinois, or been involved in litigation in Illinois. Neither visited Illinois more that four times in a year and all visits were limited to two or fewer days. Klinke visited Illinois twice each in 2010 and 2011 and all were business related and she met with Muller on only two of the occasions. Manani visited Illinois four times in 2010, three of which were board meetings and one occasion was personal. She did not meet with Muller on any of these occasions.

Halpern's affidavit states that Bellus is a Delaware corporation with its principal place of business in Philadelphia and does not conduct business in Illinois. It does not employ individuals and does not pay salaries. Its sole asset is the equity of ALS which it obtained on February 3, 2012. ALS is a limited liability company under the laws of Delaware with its principal place of business in

Michigan. ALS has its own board of managers and is separate from Bellus's board of managers. ALS keeps and maintains books, records, and accounts separate from the books, records and accounts of Bellus. ALS is fully capitalized.

Muller's response does not take issue with the conclusion that the court does not have general jurisdiction over Klinke, Manani, or Bellus. Her position is that the court has specific jurisdiction over Klinke, Manani, and Bellus because of their tortious conduct which caused injury to Muller in Illinois, citing *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997). To which Klinke and Manani respond by claiming that none of Muller's tort claims, statutory or common law, rise above pure speculative level and thus do not state claims upon which relief could be granted. As a fall back position Klinke and Manani claim entitlement to the benefits of the fiduciary shield doctrine, citing *Rollins v. Ellwood*, 565 N.E.2d 1302, 1317 (Ill. 1990). "A court should decline to exercise jurisdiction over a nonresident defendant whose conduct in Illinois had been performed solely as a corporate representative, and not for his personal benefit."

As stated in *Janmark, Inc. V. Reidy*, 132 F.3d 1200 (7th Cir. 1997), whether a court can obtain personal jurisdiction over a non-resident defendant depends on where the injury to the plaintiff occurs. This is because there is no tort without an injury. The state in which the injury occurs may require the wrongdoer to answer for her deeds. Since Illinois extended its long-arm power to the

limit allowed by the Constitution of the United States under *Calder v. Jones*, 465 U.S. 783 (1984), the state in which the victim of a tort suffers the injury may entertain a suit against the accursed tortfeasor. Therefore, in order to determine whether any of the Defendants must answer to Muller here in Illinois, it will be necessary to determine whether, the actions of the Defendants constituted tortious contact that caused injury to Muller in Illinois. If so, then the Court would have jurisdiction to hear the claims against them unless they are entitled to the benefits of the fiduciary shield doctrine.

The Court has parsed the Complaint for all allegations of wrongdoing against Klinke and Manani. Klinke, who was Muller's supervisor, is alleged to have been present when Muller was sexually harassed by Morgan. She appeared to have attempted to interfere in the investigation of Morgan by strongly suggesting that Muller temper her testimony. She "freaked out" when Muller told her about some of her testimony. Klinke was "unenthusiastic" when informed that Muller was pregnant and would have to take family leave. After Klinke was informed of some of Muller's testimony and after she learned of her pregnancy she placed her on a Performance Improvement Plan, even though Muller's performance was exemplary. Klinke told her she would need to step down as regional manager prior to her taking family leave because Muller did not have anyone ready to take her place. She demoted her to clinic manager at lower pay prior to taking her leave. Klinke fired Muller's assistant after Muller returned from

- 9 -

leave and would not allow her to hire a replacement which caused Muller to have to work longer hours. Klinke was instrumental in seeing that Muller was placed on a ninety (90) day improvement plan even though her work was exemplary.

With regard to Manani the Complaint only alleges that Manani instructed her to give a statement concerning the complaints against Morgan and that she was a recipient of a rebuttal that Muller sent to management when her work was criticized after the PIP. It is clear from the lack of allegations against Manani that she is guilty of no tortious conduct toward Muller and consequently the Court finds that it does not have personal jurisdiction over Manani.

It is clear that neither Klinke nor Manani was responsible for the alleged sexual harassment, which according to the Complaint was solely the responsibility of Morgan, therefore the count for harassment under the IHRA would not support jurisdiction. However, the allegations regarding the attempts on the part of Klinke to interfere with Muller's testimony and her concerns about her taking leave for her pregnancy, coupled with the allegations of apparent retaliation, which include the PIP placement, the demotion from Regional Manager to Clinic Manager, the firing of Muller's assistant, and the unjustified criticism which followed shortly after by Muller's termination, can give rise to an inference what some or all of these allegations were in retaliation of Muller's testimony, her leave taking, or both. It is a violation of the Illinois Human Rights Act (the "IHRA"), for a person to retaliate against another

because that person opposed what she believed to be unlawful sex harassment. 775 ILCS 5/2-101(A). It is similarly a violation of FEMA to retaliate against an employee for exercising right under the Act. 29 U.S.C. $ 2615(A)(1). Thus, these allegations are sufficient at this early stage of litigation to survive a motion to dismiss. *Austin v. Cook County*, No. 07-3184, 2009 U.S.Dist, LEXIS 23536 AT \*\*8-9. Thus, the Complaint supports personal jurisdiction unless Klinke is entitled to the benefits of the fiduciary shield doctrine.

According to the Illinois Supreme Court in *Rollins v. Ellwood*, 565 N.E.2d 1302 (1990), the rationale for the fiduciary shield doctrine is the belief that it is unreasonable and unfair to assert personal jurisdiction over an employee, whose tortious conduct causing injury in Illinois was solely a result of his employment and not the result of any personal interest or motivation. Here Klinke was Muller's supervisor and she was at least partly responsible for demoting her and in firing her assistant. Further the Complaint alleges that these acts were taken against Muller because of Klinke's personal dislike for Muller and because Muller testified in the investigation of Morgan contrary to her wishes. The doctrine according to *Brujis v. Shaw*, 876 F.Supp. 975, 979-80 (N.D.Ill. 1995) is built on the concept of fairness and whether the defendant's conduct affecting Illinois interests would make it fair to require him to defend an action in Illinois. If the Complaint is correct that Klinke acted in her self interest because of her anger at Muller

for testifying against Morgan then it is fair for her to defend her actions here in this state.

With regard to the count for intentional infliction of emotional distress, the Complaint is woefully short of allegations of any conduct on the part of either Klinke or Manani that were "truly extreme and outrageous." First there are no allegations involving Manani in any way that could be wrongful let alone extreme and outrageous. Second, with regard to Klinke, the worst that could be said is that she "unenthusiastic" when informed of her pregnancy. Thus, this count does not state a claim. *See, McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).

Next Muller asserts that the actions of the Defendants constituted tortious interference with a contractual relationship and/or prospective economic advantage. Neither of these theories of recovery apply to Manani because the Complaint is devoid of any allegations that she had anything to do with the firing of Muller or the failure on the part of Bellus to hire her. This case is closer as to Klinke but the Complaint does not say that Klinke specifically caused Muller to be fired. While Klinke criticized Muller's work, the Complaint intimates that the firing was carried out by an unnamed employee of Versa. So neither of these two Defendants can be held to have committed either tortious interference with contractual relationship nor prospective economic advantage.

Finally, the Complaint charges Klinke and Manani with civil conspiracy. In order to establish a civil conspiracy the complaint

must contain allegations that the parties "knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner. *McCoy v. Games Tech Corp.*, 2012 U.S.Dist. LEXIS 9431. The Complaint must allege an agreement and a tortious act in furtherance of that agreement. *McClure v. Owens Corning Fiberglass Corp*. 720 N.E.2d 242 (1999). There are no such allegations in the Amended Complaint.

    Finally moving on to Bellus. The Defendants' Motion is based on the fact that Bellus bought the assets of ALS free and clear of any claims. Since the closing occurred a day after Muller was fired, Defendant argues that it cannot be held liable. Muller's counsel acknowledged this before the bankruptcy judge. However, Muller alleges that she was fired the day before the closing by an individual who claimed to be employed by Versa, the private equity firm that financed the sale. Bellus counters with affidavits alleging that deal was not closed until February 3, 2012. That it was Dennis Roberts, the COO of American Laser Centers, who fired Muller and that he did so while in the employ of American Laser Centers, the debtor in bankruptcy. Since the affidavits have not been countered by Muller, her bare assertion, not under oath, that she was fired prior to the closing by someone who claimed to be employed by Versa cannot provide the evidence necessary to establish jurisdiction over Bellus.

    Since the Complaint does provide sufficient facts to establish the liability of Klinke for the tort of retaliation, there is

personal jurisdiction for Muller to proceed against her. However, the case is dismissed for want of jurisdiction against Manani and Bellus.

### III. **CONCLUSION**

For the reasons stated herein, Defendant Chelsea Klinke's Motion to Dismiss is denied. The Motions to Dismiss of Defendants Rhythm Manani and Bellus ALC Investments 1, LLC are granted.

**IT IS SO ORDERED.**

                                                                Harry D. Leinenweber, Judge
                                                                United States District Court

**DATE:** 12/27/2012